**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

GARY SUTTLE,

Petitioner,

v.

BRUCE DAVIS, et al.,

Respondents.

Civ. No. 19-17041 (KM)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.**

## I. INTRODUCTION

Pro se petitioner Gary Suttle, a state prisoner at New Jersey State Prison in Trenton, New Jersey, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. DE 1. Suttle challenges his conviction for the murder of a 60-year-old woman who was beaten to death with a hammer. For the reasons below, the petition is denied and a certificate of appealability shall not issue.

## II. BACKGROUND

### A. Factual Background[1] and Procedural History of State Proceedings

On collateral appeal, the Appellate Division summarized Suttle's criminal proceedings and the evidence underlying his conviction as follows:

> Lois Zukowitz was murdered in her Elizabeth apartment on March 11, 2004. Police investigation led to defendant, who was charged with first-degree murder, N.J.S.A. 2C:11-3(a), and possession of a weapon (a hammer) for an unlawful purpose, N.J.S.A. 2C:39-4(d). Defendant's first trial, which occurred in April 2008, produced an acquittal on the weapons offense and a hung jury on the murder charge. A second trial in July 2008 resulted in defendant's conviction of

[1] Pursuant to 28 U.S.C. § 2254(e)(1), this Court affords deference to the factual determinations of the State court.

first-degree murder and a fifty-five-year prison term. Defendant appealed, and we reversed and remanded for a new trial. *State v. Suttle*, No. A-2417-08 (App. Div. June 10, 2011). . . .

. . .

[At a third trial, which occurred in June and July 2012,] [t]he State put on witnesses and offered evidence that linked defendant to Lois's murder. The State showed that, at sometime after 10:00 p.m., on March 11, 2004, Lois's neighbor heard: her scream; a male voice command her to "shut up"; and noises that suggested someone was being punched. The neighbor called 9-1-1 sometime after 11:00 p.m., and by 11:25 p.m., police arrived, finding Lois dead and her body face down in a pool of blood. A bloody towel was found, as well as numerous blood-stained areas in the apartment. Near Lois's body, police observed a bloody impression from a Reebok sneaker. Lois's bedroom and kitchen appeared to have been ransacked.

Testimony was offered to show Lois was struck numerous times with a blunt instrument. Police found on her bed a black rubber-handled claw hammer wrapped in a plastic bag. A small clump of hair was found on the claw end; blood was found on the striking end. No fingerprints were found on the hammer, but a mixture of DNA was found on the hammer's handle. The State offered testimony that Lois could not be excluded as a potential contributor to that DNA mixture and that the other DNA probably came from a female. Defendant was excluded as a contributor to that DNA.

In the apartment, police found a black jacket with a fur collar. The jacket contained a set of keys. Investigators later determined that a key in the jacket was for the Mravlag Manor apartment of Joseph Lopez and his mother, Nilda Vargas. Vargas was defendant's girlfriend at the time. When police entered the Lopez-Vargas apartment, a partially-clothed defendant appeared from one of the rooms. Lopez went to get him some clothes and when Lopez returned with a pair of Reebok sneakers, defendant said to him, "[n]o, not those shoes." Aware of the shoe print left in Lois's apartment, police became suspicious about defendant's comment to Lopez; they obtained a search warrant for the apartment and seized the Reeboks. No blood was found on them, but, at trial, the prosecution offered evidence that the bloody shoe prints left at the crime scene were made by Reeboks.

In his testimony, Lopez confirmed the jacket was his and the keys belonged to defendant. Both Lopez and Vargas provided testimony that suggested defendant left the apartment on the day of Lois's murder and did not return until March 17, 2004. According to Lopez, when defendant departed he was in possession of Lopez's jacket but when he returned, he had neither the jacket nor his keys. Lopez testified that when defendant returned after the week's absence, he said he had been "locked up" and that the jacket was taken at the jail.

> The State called Arthur Barber, who testified that defendant told him "he had gotten himself in a little bit of trouble and he needed to get out of town." Barber also testified that defendant admitted to killing a "white woman" but that he did not mean to do it.
>
> The State also called two of Lois's neighbors who testified they saw Lois on the afternoon of her murder with an African-American man wearing a black coat with a fur hood. Two other women testified they had accompanied Lois on separate occasions to buy heroin from an African-American man who lived in Mravlag Manor. In addition, the State offered testimony that police obtained statements from others: Corrine Hartley, and her brother James Hartley, as well as Deborah Silverstein, who was a friend of Lois and who stated she had observed James Hartley with Lois in the weeks leading up to the murder.
>
> Defendant called Corrine Hartley to testify. She testified that she did not remember giving a statement to the police. But the statement she gave was read to the jury during a detective's testimony and included information such as: shortly after the murder her brother James gave her a bag of dirty clothes, which included a pair of bloody jeans; James owned sneakers that were "either Reebok, or Nike or Avia"; and James was often in the building where Lois lived. Evidence also suggested that James attended the same methadone clinic as Lois.

*State v. Suttle*, No. A-1255-17T3, 2019 WL 272491, at *1–2 (N.J. Super. Ct. App. Div. Jan. 22, 2019).

**B. Procedural History**

The jury convicted Suttle of first-degree murder, and, in August 2012, he was again sentenced to a 55-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. *Id.* at *1. The Appellate Division affirmed the conviction but remanded to eliminate a separate 30-year parole disqualifier. *Id*. Suttle filed a PCR petition in July 2016; the PCR judge denied relief without conducting an evidentiary hearing; and the Appellate Division affirmed. *Id.*

Suttle filed this petition in August 2019. DE 1. He asserts two grounds for relief: (1) "In light of the jury's not guilty finding on the possession of a weapon for an unlawful purpose . . . charge in [his] first trial, the trial court erred and violated [Suttle's] Double Jeopardy rights by denying [his] motion to preclude the prosecutor from introducing the hammer into evidence and arguing to the jury that defendant used the hammer to kill the victim" (DE 1 at 7); and (2) Suttle

"received ineffective assistance of counsel . . . when counsel failed to investigate and present evidence supporting a third-party guilt defense" (*id.* at 11). The State has filed an answer to the petition (DE 12), and Suttle has filed a reply (DE 16). This matter is therefore fully submitted and ready for decision.

## III. LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996, the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A habeas petitioner must establish entitlement to relief for each claim in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *Parker v. Matthews*, 567 U.S. 37, 40–41 (2012). District courts must be "highly deferential" to the determinations of state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

If the state courts have adjudicated a claim on the merits, the district court shall not grant a writ of habeas corpus unless that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is "clearly established" for these purposes if it is clearly expressed in "the holdings, as opposed to the dicta" of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id*. If a

petitioner challenges an allegedly erroneous state court factual determination, that determination "shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir. 2008). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

## IV. DISCUSSION

### A. Ground One

Suttle argues that the State was collaterally estopped from arguing that he killed the victim with a hammer, because he was acquitted of possession of the hammer for an unlawful purpose at his first trial. DE 1 at 7. He first asserted this argument on appeal of his conviction after his second trial. The Appellate Division rejected the argument, setting forth the applicable law as follows:

> As the United States Supreme Court held in *Ashe v. Swenson*, 397 U.S. 436, 445–46 (1970), the Double Jeopardy Clause of the Fifth Amendment includes the bar of collateral estoppel. Defining collateral estoppel as follows—"when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit"—the Court explained that the doctrine applied "'to a former judgment in a criminal case.'" *Id.* at 443 (quoting *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir. 1961)). Collateral estoppel may bar a later prosecution where the jury's acquittal in a prior case necessarily demonstrated its rejection of the essential facts on which the State sought to base the second prosecution. *See State v. Cormier*, 46 N.J. (1966).
>
> In *Yeager v. United States,* 129 S. Ct. 2360 (2009), the Court held that when a defendant is acquitted on some charges and obtains a hung jury on others, collateral estoppel principles may apply to the State's attempt to retry the defendant on the "hung counts." *Id.* at 2368–69. In deciding a collateral estoppel argument, the jury's failure to return a verdict must be treated as a "nonevent." *Id.* at 2367. That is, the trial court must not speculate on the jury's

reasons for being unable to return a verdict on some counts, and instead should focus on the significance of the acquittal. *Id.* at 2367–68.

The Court cautioned that this focus should not be mechanical or technical, but practical, in light of the way the first case was actually tried. *Id.* at 2367. Thus, a court hearing a Double Jeopardy motion based on collateral estoppel must closely scrutinize the record of the first trial to determine what was actually put in issue and necessarily decided by the jury:

> In *Ashe,* we squarely held that the Double Jeopardy Clause precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial. In that case, six poker players were robbed by a group of masked men. Ashe was charged with—and acquitted of—robbing Donald Knight, one of the six players. The State sought to retry Ashe for the robbery of another poker player only weeks after the first jury had acquitted him. The second prosecution was successful: Facing "substantially stronger" testimony from "witnesses [who] were for the most part the same," Ashe was convicted and sentenced to a 35–year prison term. We concluded that the subsequent prosecution was constitutionally prohibited. Because the only contested issue at the first trial was whether Ashe was one of the robbers, we held that the jury's verdict of acquittal collaterally estopped the State from trying him for robbing a different player during the same criminal episode. We explained that "when an issue of ultimate fact has once been determined by a valid and final judgment" of acquittal, it "cannot again be litigated" in a second trial for a separate offense. *To decipher what a jury has necessarily decided, we held that courts should "examine the record of a prior proceeding,* taking into account the pleadings, evidence, charge, and other relevant matter, *and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.*" We explained that *the inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.*"

[*Id.* at 2366–67 (emphasis added; internal citations omitted).]

*State v. Suttle*, No. A-2417-08T3, 2011 WL 2314474, at *2–3 (N.J. Super. Ct. App. Div. June 10, 2011).

The Appellate Division noted that *Yeager* was decided a year after the judge in Suttle's case decided Suttle's Double Jeopardy motion, "[h]owever, the motion judge, who had also presided over the prior trial, engaged in a similar analysis, considering what

was in issue in the first trial." *Suttle*, 2011 WL 2314474, at *3. The Appellate Division, "likewise read the record of the first trial, with an eye to how the case was tried, how the jury was charged, and whether 'a rational jury' hearing that case could have acquitted defendant of possessing a weapon (in this case, the hammer) for an unlawful purpose, on a basis that would not be inconsistent with the State's theory that he killed the victim with the hammer." *Id.* In that analysis, the Appellate Division focused on the acquittal of the charge of possession of a weapon for an unlawful purpose and, in accordance with *Yeager*, "[did] not speculate on why the jury deadlocked on the murder charge." *Id*. The court set forth the facts relevant to its analysis as follows:

> In the first trial, the prosecutor set forth the State's theory of the murder charge in his opening statement: "this defendant beat Lois Zukowitz to death with a hammer." However, he said nothing about the charge of possession of a weapon for an unlawful purpose. Defense counsel's opening likewise focused solely on the murder charge, although he stressed that defendant's fingerprints and DNA evidence were not found on the hammer.
>
> The only person who "witnessed" the crime was Jamie Brown, the tenant in the apartment next to the victim. Brown testified that on March 11, 2004, at around 11:00 p.m., he "heard the lady next door screaming," although the screaming sounded "muffled." He also heard a man's voice "telling her shut up, shut up, shut up." He then heard what sounded like someone being "punched." Believing that the victim's "boyfriend" was beating her up, he called 9–1–1 and reported a suspected domestic violence incident.
>
> When the police arrived ten to fifteen minutes later, they found the victim's apartment door unlocked. They entered the apartment and found the victim's body. Forensic evidence revealed that she had been killed by repeated blows to the head from a blunt instrument. She also had defensive injuries on her hands and arms. In the same room with the body, the police found a bloody hammer. The shapes of the victim's wounds were consistent with the shape of the hammerhead. The hammer bore DNA consistent with that of the victim and another unidentified female. Neither defendant's DNA nor his fingerprints were found on the hammer.
>
> Defendant eventually became a suspect, and a search of his residence turned up a pair of sneakers that matched bloody footprints found at the crime scene. The State also presented evidence that the victim was a drug addict who was taking methadone for her addiction but was also buying heroin. There was evidence that

> defendant was the middleman who supplied the victim with the heroin. In his testimony defendant admitted that he obtained heroin for her. According to defendant, on the day of the murder, he met Lois at her apartment. She gave him some money to buy heroin for her. Leaving his jacket at her apartment, he departed for Newark, where he bought the heroin. He then called her to find out if she was ready for him to come back to her apartment, but she told him she was not ready yet. When he finally returned to her apartment, it was night time. Arriving at the apartment, he found the door ajar. He pushed it open, and called to her but got no response. He then entered the apartment, which was in "disarray," and found Lois's body.
>
> Believing that the police would immediately accuse him of the murder because he was "a black person in [the] Elmora section of town," and she was an older white woman, he did not call the police. Instead, fearing for his own life, he fled through a window and down the fire escape, leaving his jacket in the apartment. He denied that he killed Lois. In his statement to the police, which was read into evidence, he denied seeing a hammer in the apartment.
>
> At the charge conference, all counsel agreed that the judge should not charge the jury with any lesser included offenses to murder. Therefore the jury was only charged as to murder and possession of a weapon for an unlawful purpose.
>
> In their summations, neither attorney referred to the weapons charge. Defense counsel argued that if defendant was the murderer, his DNA should have been on the hammer. However, his main arguments were that defendant was credible; that the hostile way the police treated Jamie Brown, the black man who reported the crime, corroborated defendant's opinion that it would be dangerous for a black man to call the police to the scene; that the victim's estimated time of death was consistent with defendant's testimony that she was dead when he arrived; and that the crime scene, in which the bloody footprints were not covered by any debris, was consistent with defendant's testimony that he entered the apartment after someone else had ransacked it.
>
> The prosecutor focused on rebutting those arguments, citing the circumstantial evidence of defendant's guilt. She also argued that the murderer had to be someone who knew the victim, because the brutality of the crime suggested that it was "personal" and must have stemmed from "the relationship that this defendant had with the victim." Not once in her summation did the prosecutor mention the weapons charge or explain how it related to the case or how the State had proven that charge. Nor, obviously, did she ask the jury to convict defendant of that charge.

*Suttle*, 2011 WL 2314474, at *3–4.

The Appellate Division then rejected Suttle's estoppel argument, finding that the first verdict did not estop the State from retrying Suttle on the murder charge because the first trial did not turn on whether Suttle possessed the hammer or his intent in possessing it. Rather:

> The trial focused more generally on whether [Suttle] was the killer. In fact, far from presenting "a critical issue of ultimate fact" in the first trial, [as required by *Yeager*], the weapons charge was a non-issue in that trial. As the case was actually tried, the weapons offense was a "throwaway" charge, which the State made no effort to prove. Neither attorney addressed that charge or explained what evidence supported or did not support it. Thus, when the judge gave the jury the charge on possession of a weapon for an unlawful purpose, the only factual tailoring was the judge's explanation that "[i]n this case the unlawful purpose alleged by the State is that the defendant possessed the weapon in order to beat Lois Zukowitz to death."
>
> To obtain a conviction for possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39–4d, the State must prove four elements:
>
>> (1) the item possessed was a weapon within the meaning of N.J.S.A. 2C:39–1r; (2) the defendant possessed the weapon with knowledge or awareness of control over the weapon; (3) the defendant's purpose or conscious objective was to use the weapon against the person or property of another; and (4) the defendant intended to use the weapon in a manner proscribed by law.
>
> [*State v. Villar*, 150 N.J. 503, 510 (1997).]
>
> The fourth element requires the State to prove that the accused possessed the weapon "with the actual purpose of using the weapon against another in a criminal manner." *State v. Harmon*, 104 N.J. 189, 204 (1986).
>
> In the first trial, the jury heard testimony and arguments from which they could have inferred that the murder was a crime of passion or anger. They heard testimony from Brown that a man was telling Lois to "shut up, shut up, shut up" and that Brown thought domestic violence was occurring. The prosecutor also argued that the crime was "personal" and was overkill based on the number of blows struck. Reasonable jurors might well have found that: the killer did not bring the hammer to the scene; and the killer was either using the hammer for some non-violent purpose when Lois said something to enrage him, or the killer became suddenly enraged and grabbed the first object at hand and hit Lois with it.
>
> Thus, the jury could have concluded that the killer acted in a blind, instantaneous rage and did not have time to form the purpose or conscious objective to possess the hammer as a weapon or to possess it with knowledge or awareness of control of the hammer, even if he intended to kill Lois. Or, the jury could simply have

decided that the State, which had offered no explanation to them whatsoever as to how the evidence proved the weapons charge, had failed to prove the charge beyond a reasonable doubt.

As a leading commentator noted in discussing N.J.S.A. 2C:39–4:

> [A] finding of not guilty under this section does not preclude a finding of guilt as to armed robbery, aggravated assault or other offense in which a [weapon] was used . . . because although defendant must have used or possessed a weapon in those offenses he may not have possessed it with the intention of committing any crime.

[Cannel, New Jersey Criminal Code Annotated, comment 3 on N.J.S.A. 2C:39–4 (2010).]

Addressing seemingly inconsistent verdicts, in *State v. Mieles*, 199 N.J. Super. 29 (App. Div.), *certif. denied*, 101 N.J. 265 (1985), we likewise observed:

> The verdict here may simply have reflected a finding by the jury that while defendant did not originally possess the weapon for unlawful use the difficulties between defendant and [the victim] triggered the aggravated assault and armed robbery. There would be no inconsistency in the verdict, for the possession count related to the purpose for which defendant possessed the gun and not how he used it.

[*Id.* at 41.]

Defendant was not charged with possessing the hammer as well as possessing it for an unlawful purpose. Therefore, this case is not analogous to one in which, for example, a defendant is acquitted at the first trial of both possessing the gun known to be the only possible murder weapon and of possessing it for an unlawful purpose. In those circumstances, a stronger argument might be made that acquittals on both charges could estop the State from attempting to prove in a second trial that the defendant killed the victim with that gun. But we need not address such an issue here.

Although the State's theory in the second trial, as in the first, was that defendant killed Lois with the hammer, the State did not need to prove that defendant possessed the hammer with an unlawful purpose in order to prove that he murdered her. Rather, the State was required to prove that defendant "purposely" or "knowingly" caused "death or serious bodily injury resulting in [the victim's] death." N.J.S.A. 2C:11–3(1), –3(2). On this record, we cannot accept defendant's argument that the first jury's verdict established, by principles of collateral estoppel, that defendant did not use the hammer to kill the victim. The first verdict therefore did not estop the State from retrying defendant on the murder charge.

*State v. Suttle*, No. A-2417-08T3, 2011 WL 2314474, at *5–6 (N.J. Super. Ct. App. Div. June 10, 2011) (citations omitted).

On direct appeal after the third trial, the Appellate Division rejected Suttle's Double Jeopardy argument because it was "essentially the same" as the argument it had rejected after his second trial, and therefore precluded by "the law of the case." *Suttle*, 2015 WL 9943603, at *2. The court explained:

> Law of the case is a discretionary rule that calls on one court to balance the value of judicial deference for the rulings of a coordinate court against those factors that bear on the pursuit of justice and, particularly, the search for truth.
>
> Here, that balance bars relitigation. Defendant again argues that the State was collaterally estopped from arguing that defendant killed the victim with a hammer, because defendant was acquitted of possession of the hammer for an unlawful purpose at his first trial. Although defendant argues this is a new theory of collateral estoppel, we find he makes essentially the same arguments he made in his prior appeal. Thus, this issue has been fully and fairly litigated and is the law of the case.
>
> . . . As we explained [in the prior opinion], the weapons offense in the first case was a throwaway charge, which the State made no effort to prove or argue. Indeed, neither attorney had referred to the charge in their summation. Thus, we could not "accept defendant's argument that the first jury's verdict established, by principles of collateral estoppel, that defendant did not use the hammer to kill the victim. The first verdict therefore did not estop the State from retrying defendant on the murder charge." *Suttle*, *supra*, slip op. at 16.

*Suttle*, 2015 WL 9943603, at *2–3 (citations omitted; cleaned up).

The Appellate Division's rejection of Suttle's Double Jeopardy argument was not contrary to or an unreasonable application of clearly established federal law; numerous federal courts have recognized that a defendant can be re-tried in similar circumstances (i.e., where a first trial results in an acquittal on a weapons charge and a hung jury on a charge related to use of that weapon). *See, e.g.*, *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1074–75 (6th Cir. 2015) (jury acquitted defendant of firearm-related charges in initial trial, but prosecution was nonetheless permitted to introduce evidence on retrial on rape and kidnapping charges that

defendant used a gun because use of a gun was not an essential element of rape or kidnapping); *Clarke v. Spencer*, 582 F.3d 135, 145–47 (1st Cir. 2009) (defendant was first acquitted of assault and battery with a dangerous weapon, rape by penetration with a gun, and aggravated rape (which could be proven by the use of a gun during a rape); at a subsequent trial on kidnapping and rape charges, the prosecution was permitted to introduce evidence that the defendant threatened the victim with a gun because the use of a gun was not an element of the rape and kidnapping charges); *Santamaria v. Horsley*, 133 F.3d 1242, 1247 (9th Cir. 1998) (although jury in prior murder trial found against sentence-enhancing factor that defendant used a knife, on retrial after reversal, prosecution was not precluded from presenting evidence that defendant stabbed victim with a knife because use of a knife was not a required element of a murder conviction). Accordingly, habeas relief on this ground is denied.

**B. Ground Two**

Suttle argues that his trial counsel was ineffective because he did not "investigate and present evidence supporting a third-party guilt defense." DE 1 at 11. In support, Suttle contends that counsel failed to (1) interview Corrine Hartley, James Hartley, and Deborah Silverstein and call them as witnesses; and (2) obtain DNA samples from James Hartley and Silverstein to be matched against the DNA found on the murder weapon. DE 1 at 11. The PCR court rejected these arguments. DE 12-10 at 10–24. As to Suttle's argument that counsel was ineffective for failing to interview Corrine and James Hartley and Silverstein, the court opined:

> Petitioner has not established what would have been revealed if trial counsel were to have interviewed these three witnesses. Ms. Hartley and Ms. Silverstein gave recorded statements to the police. These were certainly available to the defense through discovery. Ms. Hartley was interviewed by the police, and the notes of that interview were presumably available to the defense through discovery. Ms. Hartley's father was interviewed by the police and provided an alibi for his son. Petitioner has not come forward with any information from these witnesses that differs from that already in the record.

> Furthermore, both Ms. Hartley and Ms. Silverstein testified at trial. Ms. Hartley's trial testimony and what appears to be her whole, if not a substantial portion, of her March 18, 2014 statement were placed before the jury. Accordingly, all of her favorable testimony about Mr. Hartley's purported incriminating comments and blood on his clothes were presented to the jury.
>
> Ms. Silverstein was called as a witness during Petitioner's case in chief and was asked about her relationship with James Hartley.
>
> The State attempted to call Mr. Hartley as a witness on rebuttal, but he could not be located. It is highly doubtful that his testimony at trial would have differed from his statements to the investigating officers or been as favorable to Petitioner as the inferences, which were drawn from his statements to Ms. Hartley.
>
> As noted above, Petitioner has not established that an "interview" of these witnesses[] would have presented information that was either not before the jury already, or more favorable than the evidence presented to the jury. Therefore, Petitioner's argument is denied.

DE 12–10 at 20 (citations omitted).

As to counsel's failure to obtain DNA samples from James Hartley and Silverstein, the PCR court found that DNA testing would not have provided meaningful information and counsel used the lack of testing to support the defense:

> During trial it was revealed that the handle of the hammer contained DNA from a combined source. However, both sources were from a female contributor.
>
> Accordingly, the undisputed DNA evidence from the hammer did not inculpate Petitioner as it was that of the victim and an unidentified female. The only evidence in the case concerning the attacker was that the attacker was a male (as heard by Mr. Brown and as implied by the size of the bloody footprints). There was no evidence in the case that the attacker was a female. DNA testing of Ms. Silverstein and Mr. Hartley would have no potential evidentiary value as Ms. Silverstein could not have been the attacker and Mr. Hartley's DNA did not exist upon the hammer. Said differently, "a favorable DNA result" was an impossibility here.
>
> Furthermore, a review of the record shows that trial counsel used the lack of DNA testing skillfully to his advantage. In summation, trial counsel argued:
>
> > They never checked the DNA. Now, the DNA person said, well you know, it's likely that it's a woman's DNA, the other DNA, but we could look at it and find out, if they were ever given any chance to do that, but they were not. They were not. There were no other

> > samples ever collected. . . . A little swab in the mouth. And they could have done that. They could have asked for permission. They could have gotten court orders. They could have done an investigation, and they did not. They did not.
>
> [DE 12-25 at 37].
>
> Trial counsel later reiterated:
>
> > Are they searching for the truth, or are they prosecuting at all costs Gary Suttle? I submit to you that they're prosecuting Gary Suttle, and they have ignored the truth. They have ignored what happened. They've ignored what they should have been looking at. They should have found out whose DNA was on the hammer handle.
>
> [*Id.* at 40–41].
>
> Thus, while trial counsel did not seek to obtain a DNA sample, such an approach was entirely appropriate given that DNA testing would not have provided any meaningful information. Instead, trial counsel used the failure to test to appropriately argue reasonable doubt in conformity with the defense's theory of third-party guilt. While the strategy was not ultimately successful, that does not render counsel's decision ineffective.

DE 12–10 at 21–22.

The Appellate Division affirmed, stating that Suttle's arguments were of "insufficient merit to warrant further discussion in a written opinion." *Suttle*, 2019 WL 272491, at *1. As to the sufficiency of counsel's pretrial investigation, the court found that the PCR judge's rejection of the argument was a result "compelled by a proper application of the *Strickland/Fritz* test." *Id.* at 3. As to counsel's decision not to obtain DNA samples, the court added the following comments:

> As the judge recognized, the prosecution provided testimony that the DNA belonged to a female, thus exculpating him from that link to the hammer; for the same reason it exculpated James Hartley. But, rather than run the risk that samples from the other potential targets of defendant's third-party guilt theory would exculpate them as well, defense counsel "used the lack of DNA testing," as the PCR judge said, "skillfully to his advantage," pointing out a number of passages from defense counsel's summation along those lines. Again, because counsel took a reasonable tactical approach to this circumstance, *Strickland*, 466 U.S. at 689, defendant was unable to present a prima facie case of ineffectiveness.

*Suttle*, 2019 WL 272491, at *3.

The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim of ineffective assistance has two necessary components. *Id*. at 687. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," *id.* at 687–88, meaning he "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. Second, a petitioner must establish prejudice, i.e., a reasonable probability that the result of the trial would have been different absent the deficient act or omission. *Id.* at 687. Further, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697).

On habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the issue was unreasonable, a higher standard. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "And while judges may be tempted to second guess defense counsel's decisions, we must keep in mind that 'advocacy is an art and not a science, and . . . strategic choices must be respected in these circumstances if they are based on professional judgment.'" *Gaines v. Superintendent Benner Twp. SCI*, 33 F.4th 705, 712 (3d Cir. 2022) (quoting *Strickland*, 466 U.S. at 681). In other words, "counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better." *Rolan v. Vaughn*, 445 F.3d 671, 681–82 (3d Cir. 2006).

Here, the state courts' determination that Suttle failed to establish that counsel was ineffective was not unreasonable. As to counsel's alleged failure to interview Corrine Hartley, James Hartley, and Deborah Silverstein and call them as witnesses, the Appellate Division

reasonably found that *Strickland* compelled the PCR court's finding that counsel was not ineffective.

A failure to investigate potentially exculpatory evidence or witnesses may form the basis of ineffective assistance of counsel. *See Strickland*, 466 U.S. at 690–91; *see also Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *4–5 (D.N.J. May 2, 2016). To establish this claim, a petitioner "must make a comprehensive showing as to what the investigation would have produced. The focus of the inquiry must be on what information would have been obtained . . . and whether such information, assuming admissibility in court, would have produced a different result." *See Brown*, 2016 WL 1732377, at *5 (quoting *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (internal quotation marks omitted)). Where a petitioner asks the court to "speculate both as to whether [the witnesses] would have in fact have testified on his behalf and as to what [the witnesses'] testimony would have been," rather than presents the court with sworn testimony, he will not be able to establish prejudice. *Duncan v. Morton*, 256 F.3d 189, 201–02 (3d Cir. 2001) (citing *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989)); *see also Freeman v. Davis*, No. 18-8269, 2021 WL 4705009, at *17 (D.N.J. Oct. 7, 2021).

As the PCR court stated, Suttle failed to establish "that an 'interview' of these witnesses[] would have presented information that was either not before the jury already, or more favorable than the evidence presented to the jury." DE 12–10 at 20. First, Corrine Hartley and Silverstein gave statements to the police, which were available to the defense, and testified at trial. *Id*. Second, the State was unable to locate James Hartley, despite efforts to do so; thus, it is uncertain at best whether defense counsel would have been able to locate him. *Id.*; *see also* DE 12-25 at 25–26 (where the state moved for an adjournment to locate James Hartley, stating, "We've been looking for him, trying to find him," the trial judge denied the request, stating, "This case was

reversed a year and a half ago over the issue of James Hartley, third-party guilt"; "you had a year and a half to find James Hartley."). However, even if he were available, it is unlikely that he would have implicated himself in the murder. Rather, it was a reasonable strategic decision for the defense to rely on the inferences drawn from Corrine Hartley's statement—which supported the theory that her brother may have been the guilty party—than it was to risk eliciting testimony from James Hartley that would dispel any notion that he could have committed the crime.

Finally, not only does Suttle *not* establish that the witnesses would have provided favorable testimony for him, he in fact establishes the opposite; his petition reiterates that when Corrine Hartley and Silverstein testified at trial, they were unwilling to stand by the (arguably exculpatory) statements they had previously given to the police:

> Petitioner denied committing the crime. His defense was third party guilt based on Corrine Hartley's statement to police implicating her brother, James Hartley in the murder. James Hartley knew the victim from the methadone clinic. Shortly after the murder, James told his sister and Deborah Silverstein that he had to leave the state because he was in trouble. James gave Corrine a bag containing blood-stained jeans that he wanted washed. James did not allow Corrine to look inside another laundry bag he had with him. When Silverstein mentioned that the victim had quantities of money and Xanax in her apartment, James Hartley told her to "Shut up."
>
> Deborah Silverstein told police that the victim was supplied with Xanax by a black male named William and the victim was having a dispute with William over drug prices. James Hartley knew where the victim lived as Silverstein had taken him there to buy drugs just a couple of weeks before the murder.
>
> Trial counsel did not interview the Hartleys or Ms. Silverstein, nor did he seek to obtain DNA samples from any of them. ***When called by the State at Petitioner's trial, both Corrine Hartley and Deborah Silverstein feigned memory losses so complete that each of them claimed they had no recollection of the sworn statements that gave [sic] to police.***

DE 1 at 11–12 (emphasis supplied); *see also* DE 12-24 at 86–99 (Corrine Hartley testified: "when I was arrested, I was under the influence of Xanax very badly and I don't remember any of this statement at all"; "I don't believe any of it"; "My brother didn't have anything to do with

this. This is ridiculous."); DE 12-25 (when asked if there was anything about her life at the relevant time that would interfere with her memory, Silverstein responded, "I was taking Xanax"). Accordingly, Suttle's assertion that counsel was deficient for not calling these witnesses had no basis in fact.

On the record before me, the state courts' finding that counsel was not ineffective for failing to interview Corrine Hartley, James Hartley, and Deborah Silverstein and call them as witnesses is not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts. *See, e.g.*, *Eaddy v. Sauers*, No. 10-7538, 2011 WL 7409076, at *8 (E.D. Pa. Aug. 2, 2011) ("counsel's decision to not call William Jones as a witness was reasonable since his proposed testimony . . . would not have helped Petitioner"), *report and recommendation adopted*, 2012 WL 569369 (E.D. Pa. Feb. 22, 2012); *Blasi v. Atty Gen. of Com. of Pa.*, 120 F. Supp. 2d 451, 474 (M.D. Pa. 2000) ("Logically, counsel cannot be ineffective for failing to call a witness whose identity was unknown and could not have been known, or who was unavailable at the time of trial."). Suttle has also failed to show potential information from these witnesses would have produced a different result at his trial. He has thus failed to establish prejudice. *See, e.g.*, *Freeman v. Davis*, No. 2:18-CV-8269, 2021 WL 4705009, at *18 (D.N.J. Oct. 7, 2021) ("Petitioner has not provided any sworn testimony, affidavit, or certification from either witness. Petitioner's mere speculation regarding the potential witnesses' testimony is insufficient to establish prejudice.") (citation omitted); *Blasi*, 120 F. Supp. 2d at 474 ("the defense cannot have been prejudiced unless the potential witness had favorable evidence to provide"). Accordingly, Suttle is not entitled to relief on this claim.

As to counsel's failure to obtain a DNA sample from James Hartley and Silverstein to be matched against the DNA found on the murder weapon, the PCR court and Appellate Division

reasonably found that counsel's approach to the DNA evidence was strategic and, thus, entitled to deference under *Strickland*. 466 U.S. at 690; *Simmers v. Akinbabyo*, No. CV 17-1596, 2021 WL 1092577, at *9 (D. Del. Mar. 22, 2021) ("The decision whether to request DNA or fingerprint testing is a tactical one, and reasoned tactical decisions by counsel are entitled to deference."). First, the DNA evidence obtained from the hammer already supported the defense theory of third-party guilt. Suttle was definitively excluded as a contributor to that DNA. DE 12-22 at 42, 48, 50. Second, it was arguably preferable to leave the DNA unidentified than it was to potentially confirm that neither Hartley nor Silverstein were a DNA match and, thus, exculpate them as potentially responsible for the murder. Third, counsel used the lack of testing to the defense's advantage, arguing that the State was prosecuting Suttle "at all costs" instead of pursuing available leads including, most notably, identifying the DNA on the hammer. DE 12-25 at 40.

On this record, the state courts' finding that counsel's decision not to seek DNA samples "was entirely appropriate" and "a reasonable tactical approach" is not contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of facts. DE 12–10 at 22; *Suttle*, 2019 WL 272491, at *3; *see Simmers*, No. CV 17-1596, 2021 WL 1092577, at *8 ("trial counsel's strategic reasons for not obtaining DNA testing fall within the presumption of reasonableness" where counsel "planned to use the State's failure to perform DNA testing to impeach and undermine the State's case"); *see also Curry v. Secretary, Fla. Dep't of Corrections*, 735 F. App'x 609, 612 (11th Cir. 2018) (trial court did not err in denying ineffective assistance claim where counsel used absence of DNA "strategically, arguing that there was no physical evidence" linking defendant to the crime); *United States v. Roberts*, 417 F. App'x 812, 823 (10th Cir. 2011) ("Roberts' counsel made an informed, strategic decision

that further DNA testing posed more of a risk than being able to argue the absence of such evidence and we will not second-guess that choice. Counsel's performance was not deficient."); *Baker v. Yates*, No. 04-CV-1533, 2007 WL 2156072, at *14 (S.D. Cal. July 25, 2007) ("trial counsel's decision not to pursue DNA testing was a reasoned tactical decision entitled to deference" where, "[b]y adopting this strategy, counsel was able to call into question both the adequacy of the prosecution's investigation and the strength of its case with little risk to Petitioner"). Accordingly, Suttle is not entitled to relief on this claim.

## V. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Here, reasonable jurists would not find the Court's habeas ruling debatable. Accordingly, no certificate of appealability shall issue.

## VI. CONCLUSION

For the foregoing reasons, Suttle's petition is denied and no certificate of appealability shall issue. An appropriate order follows.

DATED: December 15, 2022

/s/ Kevin McNulty

KEVIN MCNULTY
United States District Judge